### John F. OUIMETTE

v.

### John MORAN.

### Civ. A. No. 88–0431H.

United States District Court,
D. Rhode Island.

Jan. 29, 1991.

Allegra E. Munson, Norfolk, Mass., John A. Baccari, Wakefield, Mass., for plaintiff.

Atty. General's Office, Caroline C. Cornwell, Providence, R.I., for defendant.

### MEMORANDUM AND ORDER

JACOB HAGOPIAN, United States Magistrate Judge.

The instant matter has been referred pursuant to 28 U.S.C. § 636(c), for the conduct of any and all further proceedings, to include trial and entry of judgment thereon with direct appeal to the Court of Appeals. Petitioner applies for *habeas corpus* relief, claiming he is in state custody in violation of the Constitution of the United States. 28 U.S.C. Section 2241, *et seq.*

HISTORICAL FACTS

The petitioner, John F. Ouimette, stands convicted of the offenses of accessory before the fact of robbery and conspiracy to commit robbery of the so-called Bonded Vault. His common trial, along with five co-defendants, began on May 26, 1976 and was completed on August 12, 1976. Three of his co-defendants were found not guilty. Petitioner, along with two of his co-defendants, Ralph Byrnes and Charles Flynn, was found guilty in a trial by jury in the Superior Court of Rhode Island and he was sentenced to life imprisonment.

Petitioner appealed the trial court's decision to the Rhode Island Supreme Court and on July 31, 1981, an appellate review of the conviction resulted in an affirmance. *State v. Byrnes*, 433 A.2d 658 (R.I.1981). Petitioner next applied for *habeas corpus* relief in this Court. The application was withdrawn, without prejudice, in May 1982. *United States v. Ralph Byrnes, et al.*, C.A. No. 81–0566B. Petitioner made a second application for *habeas corpus* relief to this Court, which was similarly dismissed without prejudice on August 2, 1986. *John Ouimette v. John Moran*, C.A. No. 85–0074B.

### POST CONVICTION RELIEF—RHODE ISLAND SUPERIOR AND SUPREME COURT

In 1987, petitioner applied for post-conviction relief in the Providence Superior Court, urging that he was unconstitutionally convicted. There, petitioner alleged that the prosecution at his criminal trial had suppressed the majority of the record of criminal convictions of the State's key witness, Robert Dussault. As a result, petitioner claims that he was unconstitutionally convicted. Petitioner also alleged that the prosecution failed to disclose to the defense that it had an agreement with Dussault to recommend leniency for Dussault on a then pending bank robbery charge in Massachusetts. Petitioner claims that evidence of this inducement for Dussault's testimony was wrongfully withheld.[1]

Petitioner argued to the Superior Court that, at trial, his attorney requested Dussault's criminal conviction record pursuant to Rule 26.1 of Super.R.Crim.P. and in response received from the State a list of four convictions. Further, petitioner contended that during a bench conference at trial, a second request was made for the full criminal conviction record of Dussault; however, no additional convictions were disclosed by the prosecutor. Petitioner argued before the Superior Court that Dussault, who was a gunman in the Bonded Vault robbery, was the only prosecution witness who had linked petitioner peripherally to the events of the robbery. The petitioner concluded, at the State post-conviction relief hearing, that the non-disclosure of Dussault's criminal conviction record coupled with the non-disclosed "deal" struck for Dussault's testimony, substantially affected his ability to effectively cross-examine Dussault. Thus petitioner claims he suffered a deprivation of his due process rights.

At the post-conviction relief hearing in the Superior Court, the State responded by filing a motion to dismiss for failure to state a claim upon which relief could be granted. On December 7, 1987, the hearing justice treated the State post-conviction proceeding as a motion for summary judgment. There, no evidentiary hearing was held on petitioner's post-conviction relief claims. The hearing justice determined that no issues of material fact existed to warrant an evidentiary hearing. He proceeded to enter a judgment as a matter of law. Accordingly, petitioner was denied post-conviction relief.

Petitioner appealed to the Rhode Island Supreme Court on an order to show cause why his appeal should not be summarily decided. On June 6, 1988, the Rhode Island Supreme Court issued a *per curiam* opinion holding that the petitioner had failed to show cause and denied his appeal. *Ouimette v. Moran*, 541 A.2d 855 (R.I. 1988).

### EXHAUSTION OF STATE REMEDIES

On July 15, 1988, the petitioner filed the present petition before this Court for a writ of *habeas corpus*, based on the same allegations he urged before the Superior Court of Rhode Island in seeking post-conviction relief there and on appeal in the Rhode Island Supreme Court in 1987. After reviewing the record, this Court issued a

---

1. Lastly, in his application for post-conviction relief, petitioner claimed he was denied due process on a third ground. Petitioner urges that he was induced, at his resentencing hearing in the Superior Court in March 1983, to waive his privilege against self-incrimination as well as a pending federal *habeas corpus* petition in exchange for a promise of a substantial sentence reduction that never materialized. Petitioner reasserts this claim in the instant petition. I need not and do not reach this last claim.

Memorandum and Order on May 26, 1989 *John Ouimette v. John Moran,* (C.A. No. 88-0431H), 1989 WL 125294. In that opinion, the Court found that petitioner had exhausted his state court remedies. *Rose v. Lundy,* 455 U.S. 509, 510, 102 S.Ct. 1198, 1199, 71 L.Ed.2d 379 (1982); *see Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982). Further, the Court found the instant claims of petitioner were the same claims as those presented to the state courts. *John Ouimette v. John Moran,* (Memorandum and Order May 26, 1989); *Frazier v. Langlois,* 412 F.2d 766 (1st Cir.1969); *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971); 28 U.S.C. Section 2254(b) (1982). Thus, the petitioner is properly before this Court since he has exhausted his available state court remedies.

### TRAVEL OF THE CASE

On December 28, 1988, the parties consented to have the instant action proceed before the U.S. Magistrate Judge. Accordingly, the instant matter was referred by U.S. District Judge Ronald R. Lagueux and the case came before this Court pursuant to 28 U.S.C. Section 636(c), for any and all further proceedings.

On January 12, 1989, this Court issued a show cause order in which the Attorney General was required to file an answer stating the true cause of detention and to show cause why this Court should not issue the writ of *habeas corpus.* In response, the Attorney General filed a motion to dismiss the petitioner's application, claiming that petitioner failed to exhaust his state remedies. The Court denied the motion and the State filed a reply to the petition for *habeas corpus* relief on June 27, 1989.

The petitioner filed various discovery motions in August of 1989. These motions included a request for admissions, a request for production of documents, interrogatories and a request to take the deposition of Chief Judge Albert DeRobbio of the Rhode Island District Court, who was the state prosecutor at the original trial of the petitioner in Rhode Island Superior Court. These motions were opposed by the State and a hearing was held on September 14, 1989. Following the hearing, an order was entered finding that the petitioner had demonstrated good cause to pursue discovery in the case. The Attorney General was ordered to respond. A motion to reconsider the order was filed by the Attorney General and upon consideration thereof, the motion was denied.

On October 12, 1989, after numerous rulings adverse to the State, the State filed a motion to vacate the reference of the instant matter to the U.S. Magistrate Judge. That motion was heard by U.S. District Judge Ronald R. Lagueux. In his ruling on the motion Judge Lagueux held, "[T]he Attorney General's novel arguments asserted in an attempt to create 'extraordinary circumstances' which would justify a vacation of the reference to the magistrate are superficial and unsubstantial and thus are firmly rejected by this Court." *Ouimette v. Moran,* 730 F.Supp. 473, 482 (D.R. I.1990). Thus, the instant matter continued to proceed before this Court on Judge Lagueux's reference of the case to the U.S. Magistrate Judge.

The next matter heard was petitioner's motion for release on bail during the pendency of his application for *habeas* relief. The hearing on petitioner's motion for bail was held on March 15, 1990. There, this Court granted the petitioner's motion, and he was released on bail pending the disposition of this petition for writ of *habeas corpus.*[2]

### ARGUMENTS OF PETITIONER AND RESPONDENT

Here, on collateral attack of his conviction, petitioner essentially reasserts the

---

**2.** This Court ordered on March 20, 1990, that the petitioner would be released on bail in the amount of $100,000.00 with surety under the following conditions:

  a.) He would remain employed;

  b.) His travel would be restricted to the New England area so as to afford him the mobility needed to remain gainfully employed;

  c.) He would contact the Federal Probation Office personally or by telephone as directed by that office;

  d.) He would submit to such other conditions as the Court would from time to time impose; and

  e.) Counsel for the petitioner was to serve as proxy.

same claims and arguments he made before the Rhode Island Superior Court, where he sought post-conviction relief.

## I. DUSSAULT'S CRIMINAL CONVICTION RECORD

Petitioner maintains that he was unable to conduct pretrial discovery since his out-of-state counsel withdrew before trial and he did not retain alternate counsel until the eve of trial. Despite this problem, petitioner's co-defendants filed a pretrial motion, pursuant to Rule 16 Super.R.Crim.P., for Robert Dussault's criminal record, which petitioner claims was critical to his cross-examination of Dussault. Petitioner maintains that not only was a specific request made for the Dussault records by his co-defendants, but a similar request was made by his trial counsel during a bench conference.[3] The petitioner was furnished a record of four previous convictions of Dussault. The prosecutor stated at trial that he did not know whether the criminal conviction record he provided to petitioner was a complete record. Whereupon, petitioner's defense counsel at trial requested that he be provided with a complete record before the end of the trial.

Although a request for the record of criminal convictions of Dussault was made, petitioner claims the prosecutor deliberately withheld the full and complete record from the defense. In the alternative, petitioner contends that even if the prosecutor did not deliberately suppress the complete record of convictions, the prosecution team had first hand knowledge of the full record of criminal convictions which should have been produced. Petitioner claims the question before this Court is whether or not the jury would have given any credibility to Dussault's testimony after being informed of his complete criminal conviction record and any "deal" he may have made with the state. The petitioner concludes that the failure of the State to produce the complete criminal conviction record clearly resulted in the denial of petitioner's right to a fair trial.

The respondent replies that the petitioner made no specific request, whether pretrial or during trial, for the criminal conviction record of Dussault. In the alternative, the respondent says that even if a specific request was made, the petitioner was given a record of all the criminal convictions in the possession of the prosecutor at the time of trial. Finally, the respondent maintains that the evidence which petitioner alleges was withheld was merely cumulative and as such was not material to the original trial. Thus, says the respondent, the petitioner did not suffer a deprivation of his constitutional rights and accordingly asks that the instant petition be denied.

## II. REWARDS, INDUCEMENTS AND PROMISES

Petitioner Ouimette claims that his due process rights were violated when the State withheld information concerning the State's inducements offered to Dussault in exchange for Dussault's testimony against Ouimette.

Petitioner says that this withholding of information prejudiced his substantial right to a fair trial. The petitioner contends the jury was entitled to know the full scope of any "deal" or negotiation by the prosecutor with Dussault which affected the credibility of Dussault's testimony against Ouimette. Additionally, petitioner maintains that the prosecutor deliberately withheld this information in order to make Dussault appear more credible in the eyes of the jury. Thus, reiterates petitioner, his right to receive a fair trial was substantially impaired.

The respondent argues that the prosecutor was completely candid when informing the defense about any "deal" or negotiations had with Dussault for his testimony. Respondent replies that the petitioner had ample opportunity to extract from Dus-

---

**3.** At the trial, a bench conference was held in which petitioner's attorney made the following statement concerning the completeness of the criminal conviction record provided by the prosecution; "I would ask between now and the end of the trial, that you make an effort to determine whether it is or not." (Tr. Bench Conf. 2–200B). This statement was a result of the prosecutor's indication that Dussault's record may not have been complete.

sault any information concerning a "deal" or negotiation on cross-examination. Respondent also says that Dussault admitted on direct examination that he would receive help from the prosecutor concerning criminal matters both within and without the State of Rhode Island. Lastly, the respondent says that neither the prosecutor nor Dussault knew at trial, in detail, what particulars the so-called "deal" would encompass in exchange for Dussault's direct testimony.

## EVIDENTIARY HEARING

The United States Supreme Court has held that "[w]hen an application by a state prisoner to a Federal Court for a writ of habeas corpus alleges facts which, if proved, would entitle him to relief, the Federal Court to which the application is made has the power to receive evidence and try the facts anew." *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); 28 U.S.C. Section 2254(d) and the enumerated exceptions therein. Given this authority, an evidentiary hearing was held in the instant matter. My findings of fact and conclusion of law follow.

## FINDINGS OF FACT BASED ON THE EVIDENTIARY HEARING

Following the evidentiary hearing the petitioner proposed findings of fact to this Court. The petitioner's proposed findings of fact remain unopposed by the respondent. The Court's findings of fact, based on the evidentiary hearing had, are these:

*Finding No. 1:* The Court finds that Robert Dussault, a gunman in the Bonded Vault robbery, was the State's principal witness against petitioner at trial. The Court finds that Robert Dussault's testimony at trial was the substantial factor which caused the conviction of the petitioner.

*Finding No. 2:* The Court finds that the petitioner's initial counsel in the Bonded Vault proceeding was an out-of-state counsel, who was allowed to withdraw early in the pretrial period. As such, the petitioner was *pro se* from that time until the eve of trial at which point he was able to obtain new counsel. As a result, petitioner obtained limited pretrial discovery on the timely filed motions of his similarly situated co-defendants for exculpatory evidence and for evidence of rewards, promises and inducements given to Robert Dussault in exchange for his testimony.

*Finding No. 3:* The Court finds that the trial court in the Bonded Vault trial consistently ruled that objections and motions of counsel for one defendant would apply equally to the other defendants and that rulings as to one would likewise apply equally to all at the common trial of all six defendants. This was so for the petitioner's discovery motion made at trial by his counsel.

*Finding No. 4:* The Court finds that the prosecution team had full knowledge, before the trial of petitioner Ouimette, that Robert Dussault confessed to committing an armed robbery in New York City. The prosecution agreed, with Dussault, to speak on the latter's behalf concerning this crime. This agreement with Dussault was in part to induce him to testify in the Bonded Vault trial. No disclosure of this was made to petitioner's counsel at trial.

*Finding No. 5:* The Court finds that the prosecution team, which included the Rhode Island State Police and the Providence Police, had full knowledge, before the time of petitioner's trial, of the following crimes committed by Dussault subsequent to the Bonded Vault robbery: a crime of housebreaking and safe break in Coventry, Rhode Island and a crime of armed robbery of a coin store in Seekonk, Massachusetts. The prosecutor in the Ouimette case agreed to assist Dussault to avoid the serving of prison time for the pending mentioned crimes. This agreement, in part, with Dussault was to induce him to testify against Ouimette in the Bonded Vault trial. The prosecutor's offer of help, or future help, for Dussault relative to those alleged crimes was never made known to Ouimette's attorney or to co-defense attorneys at the Bonded Vault trial.

*Finding No. 6:* The Court finds that the prosecutor in the Bonded Vault trial was personally aware in January 1976 that Robert Dussault admitted to robbing the Me-

chanic's National Bank in Worcester, Massachusetts. This robbery occurred subsequent to Dussault's participation in the Bonded Vault robbery. Dussault's role in both robberies was known to the prosecutor several months before Ouimette's trial began. The prosecutor promised Dussault, as part of the agreement to induce Dussault's testimony against Ouimette in the Bonded Vault trial, that the Rhode Island Attorney General's Office would negotiate with the federal authorities to insure that Dussault served no prison time for the Worcester bank robbery charge. The prosecutor, Albert E. DeRobbio, together with Edward D. Pare and Lionel J. Benjamin of the Rhode Island State Police, and other Rhode Island law enforcement officials associated with the Bonded Vault prosecution initiated those negotiations on Dussault's behalf as early as January of 1976 and pursued those negotiations until they were considered favorable for Dussault. Dussault did not serve any prison time for this robbery. These negotiations favorable to Dussault were withheld from the petitioner.

*Findings No. 7:* Based on the testimony given at the evidentiary hearing, the Court finds that the prosecutor agreed to assist Dussault, in avoiding the serving of any prison time for those charges against him which arose out of the Bonded Vault robbery. Further, the Court finds that this consideration was offered by the State in return for Dussault's testimony against all defendants at their common trial.

*Findings No. 8:* The Court finds that the evidence adduced on hearing shows that in 1968 Robert Dussault was sentenced to a term of fifteen to thirty years in the Massachusetts state prison and that he was paroled on this sentence to allow him to serve a consecutive sentence in the Greenfield County House of Correction. Dussault escaped from the Greenfield County House of Correction in 1975 while so serving that sentence. Robert Dussault had approximately twenty-one years remaining to serve on his state prison sentence at the time he escaped from the Greenfield County House of Correction. Dussault has never been called upon to resume serving any

portion of his Massachusetts state prison sentence. Yet, Massachusetts authorities were aware of Dussault's location in Rhode Island after his arrest by Rhode Island authorities. Rhode Island authorities negotiated and obtained from Massachusetts authorities a termination of the balance of Dussault's Massachusetts state prison sentence, a remission of fifteen to thirty years imprisonment. This latter part of the agreement, the remission of the state prison sentence arranged by the prosecution, and State Police in favor of Dussault was not made known to petitioner. The non-disclosure was calculated to induce Dussault's testimony against Ouimette in the Bonded Vault trial and the same was not disclosed to petitioner at trial.

*Finding No. 9:* The prosecutor agreed to help Dussault dispose of the escape charge, of which he was accused, from Greenfield County House of Correction and the remainder of the Massachusetts House of Correction jail sentence. In furtherance of that goal, the prosecution negotiated with authorities in Greenfield County, Massachusetts and made Dussault available to those authorities to testify that a guard had negligently allowed him to escape from custody. As a result, Dussault received no "jail time" for the escape charge. The defense attorneys in the Bonded Vault trial were told only that Dussault would receive some help from Rhode Island authorities for a matter which might be pending in Massachusetts.

*Finding No. 10:* The Court finds that, notwithstanding the multiple motions duly filed by co-defendants for exculpatory evidence and for evidence of rewards, promises and inducements made to Robert Dussault in exchange for his testimony, no such discovery was received by any of the defendants until a motion was made during the trial by petitioner's and a co-defendant's counsel under Rule 26.1 Super.R. Crim.P. This motion elicited the prosecutor's response. He produced a list of only four prior convictions of Robert Dussault and a videotape which was viewed by all defense counsel, which dealt with the bargain struck between the prosecution and

Dussault in January of 1976 at Las Vegas, Nevada.

*Finding No. 11:* The Court finds that the videotape of the bargain struck between the prosecutor and Robert Dussault in Las Vegas, Nevada, which was in the exclusive hands of the Attorney General's Office, was never provided to petitioner Ouimette. What was provided was a partial and unauthenticated "unofficial transcript." Petitioner was provided with a copy of a contemporaneous report from Sgt. Giblin and Lt. Rocchio of the Providence Police Department to their superior officer, Captain Robert Ricci. Those reports were contained in the Rhode Island State Police files and produced in this Court by the keeper of the records. Neither this report nor the one provided by the Attorney General's Office mentioned the crimes which were charged and pending against Dussault at the time he was induced to testify on behalf of the State.

*Finding No. 12:* The Court finds that the credibility of Robert Dussault was crucial to the finding of guilt or innocence of the two charges against the petitioner of conspiracy and accessory before the fact.

*Finding No. 13:* The Court finds that after the request by petitioner's counsel for a complete record of criminal convictions of Robert Dussault, made at a bench conference during the Bonded Vault trial, the prosecutor failed to provide such a complete record. Further, the Court finds the prosecutor could have readily produced a record of some twenty-eight criminal convictions of Dussault, all of which occurred prior to the trial of petitioner.

*Finding No. 14:* The Court finds the exhibits and testimony in this proceeding establish that records of Dussault's prior criminal convictions had been obtained by two major Rhode Island law enforcement agencies, the Rhode Island State Police and the Providence Police Department, involved in the Bonded Vault investigation and prosecution, and that those records were readily available to the prosecutor for the asking at the time of trial. Upon examination of the evidence adduced at hearing, I find that the prosecutor had in his possession some twenty-one felony and seven misdemeanor convictions of Robert Dussault before he began the prosecution of petitioner Ouimette in the Bonded Vault trial.

DUSSAULT'S RECORD

At the time of trial in *Ouimette v. State,* the following criminal convictions of Dussault were made known to petitioner's counsel in response to his request made pursuant to Super.R.Crim.P. 26.1.

09–03–58 Att. Larceny—6 months HOC

09–03–58 Interfered with police signal system—30 days jail

08–05–64 Breaking and entering bldg. in daytime with intent to commit larceny—2½ to 3 years

02–26–68 Accessory before the fact for purpose of stealing from a bank—15–30 years

The following complete cyclopedia of convictions was in the possession of the prosecution team at the time of the Bonded Vault trial but was not produced to the defense counsel:

FELONIES:

1) 07–07–58 Attempted larceny, auto—6 months HOC, 2 years probation

2) 09–03–58 Att. larceny—6 months HOC

3) 09–03–58 Theft of telephone equipment—30 days jail

4) 09–21–59 Break and enter—6 months jail

5) 12–05–62 Att. to commit larceny—2 months

6) 08–05–64 Breaking & entering bldg. in daytime—2½–3 years

7) 08–05–64 Larceny—2½–3 years

8) 09–16–66 Assault on a police officer—3 months

9) 09–16–67 Armed robbery

10) 09–16–67 Armed robbery

11) 02–26–68 Accessory before the fact for purpose of stealing from a bank—15–30 years

12) 04–04–68 Armed robbery 10–12 years

13) 04–04–68 Accessory before the fact of armed robbery 10–12 years

14) 04–04–68 Accessory before the fact of armed robbery while masked and disguised—10–12 years

15) 04–04–68 Armed robbery while masked and disguised—10–12 years

16) 04–04–68 Armed robbery—7–10 years

17) 04–04–68 Armed assault to rob—10–12 years

18) 04–04–68 Armed robbery—10–12 years

19) 04–04–68 Armed robbery—10–12 years

20) 10–20–72 Auto theft

21) 01–14–73 Escaped from confinement—1 year

MISDEMEANORS:

22) 09–03–58 Interfered with police signal system—30 days jail

23) 02–25–60 Drunk—30 days HOC & 1 year probation

24) 02–25–60 Disturbing the peace—$10.00 fine

25) 07–03–61 Property damage—$25.00 or 25 days

26) 01–25–65 Drunk—$10.00 fine

27) 10–25–65 Mal. injury to property—$25.00 fine

28) 10–25–66 Disturbing the peace—guilty, filed

## III. ANALYSIS BY THE COURT

Generally, this Court must defer to the state court's determinations of facts as presumptively correct when it considers a *habeas corpus* petition. 28 U.S.C. Section 2254(d). The petitioner, however, is not bound by such presumptive correctness since he brings himself within enumerated exceptions of 28 U.S.C. Section 2254(d). *Sumner v. Mata*, 449 U.S. 539, 547, 101 S.Ct. 764, 769, 66 L.Ed.2d 722 (1981); *Neron v. Tierney*, 841 F.2d 1197, 1199 (1st Cir.1988). Additionally, the state court findings on the question of whether the State's non-disclosure of certain evidence

does violence to the holding in *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), involves mixed questions of fact and law. As such, the state court findings, to the extent that any were made, are not binding on this Court. *Chaney v. Brown*, 730 F.2d 1334, 1346 (10th Cir.), *cert. denied*, 469 U.S. 1090, 105 S.Ct. 601, 83 L.Ed.2d 710 (1984). Here, no findings of fact were adduced from a state evidentiary hearing.

The question raised by the petitioner in his *habeas* petition is whether the withholding of evidence by the prosecution violated his constitutional due process rights. In *Brady*, the Supreme Court declared the rule to be applied when such an allegation is made. There, the Court held:

"that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."

*Brady, supra,* 373 U.S. at 87, 83 S.Ct. at 1196.

The policy behind this rule, as stated by the Supreme Court, is that "[S]ociety wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." *Brady, supra,* at 87, 83 S.Ct. at 1197.

The Supreme Court elaborated on the *Brady* rule in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). There, the Court declared criteria to be applied by prosecutors when determining whether evidence in their possession should be disclosed to the accused. The *Agurs* Court dealt with three scenarios in which the *Brady* rule would apply.[4] Thus, to determine whether the petitioner's due process rights have been violated, this Court in applying the *Brady* rule must look to the categories declared in *Agurs, supra.*

---

**4.** The three scenarios involving undisclosed evidence the Supreme Court dealt with are as follows: (1) where the prosecutor used perjured testimony and knew or should have known of the perjury but failed to notify the defense counsel; (2) where the defense counsel makes a specific request before trial and the prosecutor withholds such information; (3) failure to disclose favorable evidence never specifically requested. Here the evidence has to be obviously exculpatory. *Id.* at 103–107, 96 S.Ct. at 2397–2399.

### A. The Specific Request

I find the record belies the respondent's contention that there was no pretrial request made by petitioner for Dussault's criminal conviction record. That a request was made is certain. Neither *Brady* nor *Agurs* requires that such a request must be etched in stone. It is uncontroverted that petitioner's co-defendants made a pretrial request and a request immediately upon completion of Dussault's direct testimony against the accused for his criminal conviction record. Petitioner's attorney made his own request for Dussault's complete criminal conviction record during a bench conference at trial.

Once the request was made, the prosecutor was on notice and had a duty to disclose exactly what the defense had requested. The evidentiary hearing held on July 27, 1990 by this Court, shed considerable light on exactly what the State had in its possession at the time of trial. Evidence adduced at the hearing clearly demonstrates that the prosecutor had full knowledge of some twenty-eight convictions at the time of trial. *See* Evidentiary Hearing Exhibits 1, 2, 3, & 4. How the State can now be heard to claim the prosecutor at trial did not have in his possession the complete record of Dussault's convictions is beyond this Court's comprehension. The Supreme Court has held that:

> "[A]lthough there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor, *if the subject matter of such a request is material,* or indeed, if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge." (emphasis added) *United States v. Agurs,* 427 U.S. 97, 106 [96 S.Ct. 2392, 2399, 49 L.Ed.2d 342] (1976).

Having found that a request was made by petitioner, it seems clear that the prosecutor had a duty to disclose the requested information as required by the decision in *Agurs.* I can think of no matter more material than a complete record of previous convictions of the State's star witness, Dussault, to be used for demonstrating the unworthiness of belief of his testimony against Ouimette.

### B. Materiality of the Requested Material

Clearly, the Supreme Court did not intend that the prosecutor make every scintilla of information in his file available for the defense counsel.[5] However, everything which is deemed material is obviously covered by the standard in *Agurs.*

The Supreme Court expounded on the standard of materiality question in *United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). The Court in *Bagley,* dealing with facts similar to those in the instant matter, went on to declare a materiality test in cases where the prosecutor failed to disclose evidence favorable to the defense:

> The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Id.* at 682, 105 S.Ct. at 3383.

Turning to the materiality of the information requested by the petitioner, I find the information sought was material measured by the standards presented in *Agurs* and *Bagley.* In *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Supreme Court held that evidence favorable to the accused which is sought to be used for impeachment falls within the *Brady* rule. *Id.* at 154, 92 S.Ct. at 766. Clearly, the petitioner in seeking Dussault's criminal record of any inducements for his testimony, sought to use that type of evidence to destroy Dussault's worthiness of belief. The Supreme Court recognized the significance of impeachment testimony when it held in *Bagley* that

---

**5.** The Supreme Court in *Agurs* held: "[t]he prosecutor will not have violated his constitutional duty of disclosure unless his omission is of sufficient significance to result in the denial of the defendant's right to a fair trial." *Agurs, supra,* 427 U.S. at 103, 96 S.Ct. at 2397.

"[s]uch evidence is 'evidence favorable to an accused' so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." *Bagley, supra,* 473 U.S. at 676, 105 S.Ct. at 3380 (citing *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196, 10 L.Ed.2d 215 (1963)).

In considering Dussault's criminal record on petitioner's hearing for post-conviction relief, Rhode Island Superior Court Judge James Bulman observed: "I agree with you that the record he [Dussault] has would be so devastating were it shown to a jury, it would be much more than impeachment ... you would have to be in a sleepwalker dream to think that records like that wouldn't influence a jury." (Post–Conviction Relief Transcript, December 7, 1987, p. 16). Today, the State seeks to mitigate the effect this evidence would have had on the outcome of the trial by claiming that it is merely cumulative. I find the respondent's claim that the requested material was merely cumulative of the four disclosed convictions and would not have affected the outcome of the trial, to miss the mark and to be without merit. Here, something more than the repetitiveness of Dussault's four disclosed convictions is involved. The something more is the failure of the prosecutor to disclose an additional twenty four (24) previous convictions. Thus, a showing of Dussault's 28 previous convictions which, if disclosed to the jury, would have had a "devastating" affect on Dussault's credibility. Its suppression might have affected the outcome of the trial. I find there is a reasonable probability that had the evidence been disclosed to the defense the result of the trial would have been different.

### C. The Prosecutor's Role

The respondent correctly asserts the *Brady* rule is a tripartite test. Having already discussed two of the three requirements determining whether a request was made and weighing the materiality of the requested information, the Court now turns to the final issue of whether or not the prosecutor suppressed the requested information.

Petitioner alleges the prosecution suppressed the requested evidence in order to make Dussault appear more credible to the jury. To determine that likelihood, I now turn to the evidentiary hearing held in this Court. There, several of the law enforcement personnel who participated in the Bonded Vault investigation testified in open court. Despite the unfortunate memory lapses of two of the police officers who testified, two others, both former Captain Pare of the Rhode Island State Police, and Sergeant Giblin of the Providence Police Department, stated they were aware of the extensive criminal conviction record of Dussault. They testified that they shared this information with each other and with the prosecutor. Both testified that they were aware of criminal convictions substantially more in number than were actually turned over to the petitioner by the prosecutor. In fact, Sergeant Giblin testified that by the inception of the Bonded Vault trial, he had obtained the complete criminal record of Robert Dussault. Sergeant Giblin further stated that whatever he had obtained in the way of a criminal record on Dussault through the course of his investigation was made known to the prosecution. The overwhelming amount of evidence produced at the evidentiary hearing demonstrated that the prosecutor knew of the information sought by the petitioner. Thus, the Court can arrive at no other conclusion but that the prosecutor intentionally suppressed the requested evidence.

Here, the prosecutor had an independent duty to voluntarily disclose the material information. I recognize that the Supreme Court in *Agurs* held, "[F]or unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose." *Agurs, supra,* 427 U.S. at 108, 96 S.Ct. at 2399. I find, however, that the evidence specifically requested by petitioner Ouimette was material to the jury's finding of his guilt or innocence. If disclosed, the evidence could have fairly raised a reasonable doubt as to the accused's guilt. Accordingly, the failure of

the prosecutor to perform his constitutional duty of disclosing the requested material evidence favorable to petitioner violated petitioner's due process rights to a fair trial. It is not the fundamental duty of a prosecutor to obtain a conviction at any cost but to see that justice is done. In this regard, "[T]he prosecutors role transcends that of an adversary." *Agurs, supra.* He may deal hard blows but they must be fair blows.

### D. Inducements, Promises or Rewards Made to Robert Dussault

The evidence demonstrates that inducements, promises or rewards were made to Dussault by the State. I find that the failure to disclose to Ouimette such agreements was part of the State's masterfully orchestrated plan to withhold from petitioner information, which if disclosed, could demonstrate beyond doubt that its star witness, Dussault, should not be believed.

The respondent maintains the petitioner never made a pretrial request for evidence of any inducement or promises made for Dussault's testimony. Thus, says, the respondent the petitioner has no standing to raise the issue of non-disclosure. Further, respondent argues that even if petitioner does have standing, the full extent of any "deal" or negotiation was made known to petitioner by way of Dussault's cross-examination during the Bonded Vault trial.

These arguments find no support in the facts found or in law. See *Finding No. 10, supra; U.S. v. Bagley, supra,* 473 U.S. at 682, 105 S.Ct. at 3383. Further, I find the materiality of the inducements or promises made to Dussault was sufficient to require voluntary disclosure by the prosecutor. *United States v. Agurs, supra,* 427 U.S. at 109, 96 S.Ct. at 2400. It seems clear that evidence of this nature would have been used by the petitioner to show bias or prejudice on the part of Dussault and his willingness to tailor his testimony in exchange for a more favorable recommendation from Rhode Island authorities. Why else would the State act as it did? I find that there was "a significant chance that the non-disclosed [item], developed by skillful counsel, could have induced a reasonable doubt in the minds of enough jurors to avoid a conviction." *United States v. Fried,* 486 F.2d 201, 203 (2d Cir.1973).

The evidence of any such inducement most assuredly would have been used to demonstrate how the State of Rhode Island met its obligation to Dussault and how Dussault, by his testimony, met his to the State. A showing of purchased testimony could well induce a reasonable doubt of guilt in the minds of jurors. This secreted mutuality of accommodation does violence to basic notions of justice and fair play.

### HARMLESS ERROR STANDARD— PREJUDICIAL ERROR

Lastly, the respondent argues that if this Court finds the prosecution in the Bonded Vault trial withheld the evidence alleged, there must still be a dismissal based on the harmless error standard of *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Respondent maintains that based on *Chapman,* if the Court finds "the prosecutor erred in failing to disclose the evidence with which to impeach Dussault, there can be no doubt that the error did not contribute to the verdict against the petitioner."

Although the respondent states the proper standard for harmless error, I do not find that the respondent properly applies that standard to the instant matter. The Supreme Court in *Chapman* held that the State must prove beyond a reasonable doubt that the constitutional deprivation complained of did not contribute to the verdict. *Id.* at 24, 87 S.Ct. at 828. Here, the burden of proof is upon the State and not the petitioner. The State has failed to demonstrate to this Court that the evidence sought by petitioner would not have affected the outcome of the trial. Additionally, I find otherwise.

After careful review of the record, it seems clear that Dussault's testimony was a major and dominant factor in the conviction of petitioner. Absent Dussault as a credible witness, I find that the State would have had insufficient proof of the accused's guilt as to every essential element of the two offenses charged. To

deny the petitioner his right to impeach the credibility of Dussault and thus challenge his worthiness of belief in the minds of the jurors, surely rises to the level of prejudicial error of constitutional dimension affecting the substantial rights of the accused. I so find. *Reed v. Ross,* 468 U.S. 1, 12, 104 S.Ct. 2901, 2908, 82 L.Ed.2d 1 (1984); *Murray v. Carrier,* 477 U.S. 478, 494, 106 S.Ct. 2639, 2648, 91 L.Ed.2d 397 (1986).

### CONCLUSION

I am most mindful that constitutional considerations of comity and federalism require that I accord, and I do, great deference to the judicial proceedings had at the state level in this proceeding. The detailed factual record, however, developed before me on collateral hearing and review, discloses for the first time factual matters which speak of official lawlessness. The constitutional trespass, which I find in the instant case, is not a simple matter of "when the constable blunders the criminal goes free." Given the evidentiary record, I can only conclude that Rhode Island officialdom, high and low, did their best to deliberately and secretly harbor Dussault, a career criminal, from the full consequences of numerous felony prosecutions then pending in exchange for securing the conviction of petitioner.

I recognize that a prosecutor need not make a complete and detailed accounting to the defense of all police investigative work on a case, nor is defense counsel entitled to rummage through the entire file of the prosecutor. The prosecutor may exercise, as here, prosecutorial discretion to prosecute an accused or not. This is generally an acceptable practice. So is the seeking of all types of immunity from prosecution in exchange for the testimony of a witness, or the prosecutor's promise to recommend leniency or to promise protective custody to a potential witness. In most instances, as here, the law enforcement and prosecutorial efforts are engaged in the highly competitive activity of competing with the criminal element. The stakes involved and the price paid in this case are now of record.

Here, the assertion and exercise of prerogatives by the State not to disclose evidence favorable to the accused, like the assertion of the king's prerogative powers, invites the inevitable and draws immediate fire calling for corrective and responsive scrutiny. Although unbridled prerogative powers of government were abolished in England by Magna Charta in 1215 A.D. and in America by the Constitution's Bill of Rights, here, they were alive and well in Rhode Island. Rhode Island's prosecutorial team enjoyed exclusive and peculiar privilege to fashion and shape Dussault as a credible witness against the accused. The prosecutions' coverup and censorship at trial of their preemptive activity is what remains as constitutionally actionable.

Having done this was not enough. Officialdom secreted and failed to disclose at petitioner's trial some twenty-eight criminal convictions of their star witness, Dussault, as surety for the conviction of the petitioner. All of this, the State seeks today to defend and justify. His trial was based upon prosecutorial concealment and not upon disclosure. These discredited practices not only do violence to constitutional notions of due process, they do violence to fundamental notions of justice and fair play which all free people should enjoy. The State's assertion and exercise of prerogative powers and censorship may not transcend the Constitution. Although no person is entitled to a perfect trial, the basic law of the land, our Constitution, guarantees that every person is entitled to a fair trial. The record before me shouts that the petitioner, Ouimette, was denied a fair trial, and I so find, as I must.

The federal courts have been given broad discretion when granting a judgment for *habeas* relief. *Hilton v. Braunskill,* 481 U.S. 770, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987); *Fay v. Noia,* 372 U.S. 391, 431, 83 S.Ct. 822, 844, 9 L.Ed.2d 837 (1963). Title 28 U.S.C. Section 2243 authorizes the federal courts to dispose of *habeas corpus* petitions "as law and justice require." Given the facts I have found, law and justice requires that John F. Ouimette's petition for *habeas corpus* be granted unconditionally. Although unconditional release from

custody is generally granted with great caution and reluctance, the gross violations of petitioner's due process rights were so egregious that his unconditional release from custody is required.

Accordingly, judgement shall enter in favor of petitioner John F. Ouimette and against the respondent State of Rhode Island. The petitioner, John F. Ouimette, is unconditionally released and discharged from the custody of the State of Rhode Island. It is so ORDERED.