John F. OUIMETTE, Plaintiff, Appellee,

v.

John MORAN, Director of the
Department of Corrections,
Defendant, Appellant.

No. 91–1213.

United States Court of Appeals,
First Circuit.

Heard June 5, 1991.

Decided Aug. 6, 1991.

Caroline C. Cornwell, Sp. Asst. Atty. Gen., with whom Walter Gorman, Sp. Asst. Atty. Gen., and James E. O'Neil, Atty. Gen., were on brief, for defendant, appellant.

Allegra E. Munson with whom John A. Baccari was on brief, for plaintiff, appellee.

Before BREYER, Chief Judge,
BOWNES, Senior Circuit Judge, and
CAFFREY,* Senior District Judge.

BOWNES, Senior Circuit Judge.

The state of Rhode Island appeals the federal grant of a writ of habeas corpus ordering unconditional release of petitioner John F. Ouimette. Ouimette was convicted in 1976 for robbery and conspiracy to commit robbery and sentenced to life imprisonment then resentenced in 1983 to a forty-five-year term with fifteen years suspended. The state presents three related issues: (1) whether it was clearly erroneous for the federal magistrate-judge[1] to augment petitioner's state court record and grant the writ under 28 U.S.C. § 2254(d);[2] (2) whether there was clear error in the findings of fact by the court below; and (3) whether the court's holding that there was a due process constitutional violation under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), was erroneous. The crux of the magistrate's opinion is that in violation of Ouimette's constitutional rights to due process of law, the state prosecutor at trial did not disclose the extensive criminal record of the state's chief witness against Ouimette, Robert Dussault, and withheld from Ouimette the existence and nature of Dussault's deals with the state in return for his inculpatory testimony. We uphold the order of the district court releasing the petitioner on a writ of habeas corpus.

## I. CHRONOLOGY OF CASE

The petitioner, John F. Ouimette, was arraigned in Rhode Island Superior Court on January 8, 1976, on charges of accessory before the fact of robbery and conspiracy to commit robbery of the Bonded Vault Company in Providence on August 14, 1975. Nine masked men had entered this commercial safe-deposit company, robbed its employees at gunpoint, then had broken into 146 safe-deposit boxes. They "garnered approximately $4 million in cash and valuables." *State v. Byrnes,* 433 A.2d 658, 661 (R.I.1981). On August 12, 1976, Ouimette, who did not physically participate in

---

* Of the District of Massachusetts, sitting by designation.

1. In late 1988, by consent of the parties pursuant to 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, Ouimette's habeas petition was referred to Magistrate Hagopian. When the magistrate issued a show cause order on January 12, 1989, the Rhode Island Attorney General moved to dismiss; the motion was denied. Petitioner filed various discovery motions in August of 1989, including a request to depose the prosecutor, Albert DeRobbio, now Chief Judge of the Rhode Island District Court; the State requested a good cause hearing. Magistrate Hagopian held on September 14, 1989, that petitioner had demonstrated good cause to pursue discovery. On October 12, 1989, the Attorney General asked the federal district court to vacate reference of this matter to a magistrate acting as a judge. Judge Lagueux held that the habeas petition could rightfully be referred to a magistrate and that the Attorney General failed to establish any extraordinary circumstances warranting vacation of this reference. *Ouimette v. Moran,* 730 F.Supp. 473 (D.R.I.1990).

2. 28 U.S.C. § 2254 reads in pertinent part:

In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction ... shall be presumed to be correct, *unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit—*

(1) that the merits of the factual dispute were not resolved in the State court hearing;

(2) that the factfinding procedure employed by the State court was not adequate to afford a full and fair hearing;

(3) that the material facts were not adequately developed at the State court hearing;

. . . . . .

(6) that the applicant did not receive a full, fair, and adequate hearing in the State court proceeding; or

(7) that the applicant was otherwise denied due process of law in the State court proceeding;

. . . .

(Emphasis added).

the robbery, was convicted on the two counts charged. He was subsequently sentenced to life imprisonment as were two co-defendants, Ralph Byrnes and Charles Flynn. Three other co-defendants, including Ouimette's cousin Walter, were acquitted.[3]

In July of 1981 the Rhode Island Supreme Court affirmed the convictions of Ouimette, Byrnes and Flynn. *Id.* Ouimette began serving his life sentence on September 8, 1981. In March of 1983 a three-judge panel established by the Rhode Island Supreme Court, 456 A.2d 742 (R.I.1983), reduced Ouimette's life sentence to forty-five years with fifteen years suspended upon his admission of guilt in the Bonded Vault robbery and his agreement to withdraw his habeas petition. An appeal of this resentencing decision was denied and dismissed by the Rhode Island Supreme Court in 1984. 479 A.2d 702 (R.I.1984).

In 1986 Ouimette again petitioned for habeas corpus relief. His grounds were the same as those asserted successfully by his co-defendant Flynn before the First Circuit. Flynn had filed a petition for writ of habeas corpus alleging constitutional error in part because of the presence of four uniformed, armed state police sitting directly behind the defendants in the courtroom at trial. Although the district court dismissed Flynn's petition, *Flynn v. Holbrook*, 581 F.Supp. 990 (D.R.I.1984), this dismissal was reversed by the court of appeals. *Flynn v. Holbrook*, 749 F.2d 961 (1st Cir.1984). The Supreme Court then unanimously reversed the First Circuit, annihilating the issue for Ouimette's 1986 habeas petition. *Holbrook v. Flynn*, 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986).

In 1987 Ouimette's petition for post-conviction relief was again denied by the state court, this time by summary judgment. The Rhode Island Supreme Court similarly denied Ouimette's appeal for failure to show cause. *Ouimette v. Moran*, 541 A.2d 855 (R.I.1988). In July of 1988 petitioner filed his present request for habeas corpus. *Ouimette v. Moran*, No. 88–0431H, 1989 WL 125294 (D.R.I.1989) (LEXIS 8926). The federal court then held that Ouimette had exhausted his state remedies and denied the state's motion to dismiss. *Ouimette v. Moran*, No. 88–0431H, 1989 WL 125294 (D.R.I. May 26, 1989). Civil discovery was granted in September 1989. By March of 1990 Ouimette was released on bail. The magistrate held a one-day evidentiary hearing on July 27, 1990. Finally, in January of 1991 the magistrate granted Ouimette's habeas petition and ordered his unconditional release. *Ouimette v. Moran*, 762 F.Supp. 468 (D.R.I.1991) (memorandum and order).[4] This appeal by the State followed.

## II. GRANT OF HABEAS UNDER § 2254

The state has claimed that the magistrate erred in augmenting the state court record and granting habeas corpus under 28 U.S.C. § 2254(d) without adverting to specific material facts and correlating them with one or more of the eight listed exceptions under § 2254(d), as required by *Sumner v. Mata*, 449 U.S. 539, 551, 101 S.Ct. 764, 771, 66 L.Ed.2d 722 (1981). On the other hand, petitioner insists that because the state court rejected the need for an evidentiary hearing and dismissed petitioner's habeas request without comment, the magistrate possessed no specific facts for reference or refutation.

It is a truism that federal courts have broad discretionary powers when acting on habeas petitions. Indeed, 28 U.S.C. § 2243 requires federal courts to deal with

---

**3.** Ouimette and his family are no strangers to the criminal justice system in Rhode Island. The petitioner had been acquitted in a conspiracy to murder trial in 1972 in which another brother, Gerard Ouimette, was convicted and the conviction upheld. *In re Ouimette*, 115 R.I. 169, 342 A.2d 250 (1975). Yet another brother, Frederick Ouimette, was convicted for the homicide of Michael Greene, one of the objects of the murder conspiracy. *State v. Ouimette*, 110 R.I. 747, 298 A.2d 124 (1972).

**4.** This order is incorrectly dated January 29, 1990, when it was, in fact, issued on January 29, 1991.

habeas corpus petitions "as law and justice require." *See Hilton v. Braunskill*, 481 U.S. 770, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987); *Fay v. Noia*, 372 U.S. 391, 422, 83 S.Ct. 822, 840, 9 L.Ed.2d 837 (1963) ("Even if the state court adjudication turns wholly on primary, historical facts, the Federal District Court has a broad *power* on habeas to hold an evidentiary hearing and determine the facts.") (emphasis original) (footnote omitted), *overruled on other grounds*, *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). Further, 28 U.S.C. § 2255 explicitly provides that "a petitioner is entitled to an evidentiary hearing on his motion '[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" *Dziurgot v. Luther*, 897 F.2d 1222, 1225 (1st Cir.1990) (quoting § 2255). In the instant case, the state court had dismissed Ouimette's petition without an evidentiary hearing. The magistrate correctly acknowledged exhaustion of the petitioner's state remedies, granted discovery, then held an evidentiary hearing.

■ Because "[o]ur review of a state court conviction is limited to searching for constitutional error," *Grieco v. Meachum*, 533 F.2d 713, 716 (1st Cir.) (citing 28 U.S.C. § 2254(a)), *cert. denied sub nom. Cassesso v. Meachum*, 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 135 (1976), a federal court "must apply federal constitutional law in habeas corpus proceedings," and it "may apply that law to reliably found state facts." *Santos v. Laurie*, 433 F.Supp. 195, 197 (D.R.I.1977). There is generally a presumption of correctness for state court findings of fact pursuant to § 2254(d) "unless any of eight exceptions applies." *Chaney v. Brown*, 730 F.2d 1334, 1344 & n. 16 (10th Cir.), *cert. denied*, 469 U.S. 1090, 105 S.Ct. 601, 83 L.Ed.2d 710 (1984). These eight exceptions enumerated in § 2254(d) (*see* n. 2, *supra*) include the state court's: (1) failure to resolve the merits of the factual dispute, (2) inadequate factfinding procedure and (3) inadequate development of material facts.

■ In this case there were no explicit state court factfindings on Ouimette's state habeas petitions. No evidentiary hearings were held nor was Ouimette afforded any discovery procedure. In the Supreme Court's second holding in *Sumner v. Mata*, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982) (per curiam), the Court stated that "federal courts are not necessarily bound by the state court's findings" and can conclude simply that "a state finding was 'not fairly supported by the record.'" *Id.* at 597, 102 S.Ct. at 1307. Here the state court made no findings per se, only conclusions implicit in its dismissal of the habeas plea.

The district court's thirty-page opinion, based on the facts disclosed by discovery and a one-day evidentiary hearing, establish that the state court's factfinding procedure was inadequate; this resulted in an inadequate development of material facts. The federal habeas case focused on facts *not* disclosed in the state court trial. By its very nature, therefore, it implicated inadequate factfinding by the state court. We hold that the district court included within its opinion "the reasoning which led it to conclude that any of the first seven factors were present." *Sumner v. Mata*, 449 U.S. at 551, 101 S.Ct. at 771.

■ Moreover, the particular issue of the materiality of those facts withheld by the prosecution during the state trial is not entirely a question of fact. It is a mixed question of fact and law, not subject to § 2254(d) and its exceptions.

> "The question of materiality present in cases in which the accused complains of prosecutorial suppression of material evidence is.... [a] mixed question[ ] of law and fact calling ultimately for a legal determination.... and therefore [is] not entitled to a § 2254(d) presumption of validity."

*Chaney v. Brown*, 730 F.2d at 1346 (quoting *Davis v. Heyd*, 479 F.2d 446, 451 (5th Cir.1973)). The § 2254 presumption of correctness of state court factfinding applies *only* to "basic, primary or historical facts." *Cuyler v. Sullivan*, 446 U.S. 335, 341–42, 100 S.Ct. 1708, 1714, 64 L.Ed.2d 333 (1980). *See also Marshall v. Lonberger*, 459 U.S. 422, 431, 103 S.Ct. 843, 849, 74 L.Ed.2d 646

(1983); *Sumner v. Mata,* 455 U.S. at 598, 102 S.Ct. at 1307 (distinguishing between law and fact according to statutory presumption of § 2254). We have "adhered steadfastly to the rule that findings of both historic and ultimate fact [mixed questions of law and fact] are tested by the 'clearly erroneous' rule on appeal." *United States v. Cochrane,* 896 F.2d 635, 639 (1st Cir.), *cert. denied,* — U.S. ——, 110 S.Ct. 2627, 110 L.Ed.2d 647 (1990). *See also Lynch v. Dukakis,* 719 F.2d 504, 513 (1st Cir.1983).

The district court committed no error in augmenting the state court record, mandating discovery, conducting an evidentiary hearing and making fourteen findings of fact in regard to Ouimette's habeas petition. The long-familiar clear error standard articulated in Fed.R.Civ.P. 52(a) states:

> Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses.

This standard is proper for review of factual findings of a district court in habeas corpus proceedings. *Ray v. Rose,* 535 F.2d 966 (6th Cir.), *cert. denied,* 429 U.S. 1026, 97 S.Ct. 648, 50 L.Ed.2d 629 (1976). Under *Anderson v. Bessemer City,* the Supreme Court has held that to find such error "the reviewing court on the entire evidence" must be "left with the definite and firm conviction that a mistake has been committed." 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (citing *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). We find no such mistake and will now discuss the specific findings of fact by the district court.

### III. MAGISTRATE'S FINDINGS OF FACT

Of the fourteen findings of fact made by the district court, the State claims nine are clearly errorroneous. The first three challenged, findings 4, 5, and 6, can be addressed collectively because they all deal with specific and related acts of non-disclosure by the prosecution team at the Bonded Vault trial.

*Finding No. 4:* The Court finds that the prosecution team had full knowledge, before the trial of petitioner Ouimette, that Robert Dussault confessed to committing an armed robbery in New York City. The prosecution agreed, with Dussault, to speak on the latter's behalf concerning this crime. This agreement with Dussault was in part to induce him to testify in the Bonded Vault trial. No disclosure of this was made to petitioner's counsel at trial.

*Finding No. 5:* The Court finds that the prosecution team, which included the Rhode Island State Police and the Providence Police had full knowledge, before the time of petitioner's trial, of the following crimes committed by Dussault subsequent to the Bonded Vault robbery: a crime of housebreaking and safe break in Coventry, Rhode Island and a crime of armed robbery of a coin store in Seekonk, Massachusetts. The prosecutor in the Ouimette case agreed to assist Dussault to avoid the serving of prison time for the pending mentioned crimes.... The prosecutor's offer of help ... was never made known to Ouimette's attorney or to co-defense attorneys at the Bonded Vault trial.

*Finding No. 6:* The Court finds that the prosecutor in the Bonded Vault trial was personally aware in January 1976 that Robert Dussault admitted to robbing the Mechanic's National Bank in Worcester, Massachusetts. This robbery occurred subsequent to Dussault's participation in the Bonded Vault robbery ... [and] was known to the prosecutor several months before Ouimette's trial began. The prosecutor promised Dussault ... that the Rhode Island Attorney General's Office would negotiate with the federal authorities to insure that Dussault served no prison time for the Worcester bank robbery charge. The prosecutor, Albert E. DeRobbio, together with Edward D. Pare and Lionel J. Benjamin of the Rhode Island State Police, and other Rhode Island law enforcement officials associated with the Bonded

Vault prosecution initiated those negotiations on Dussault's behalf as early as January of 1976 ... [These] were withheld from the petitioner.

*Ouimette v. Moran,* 762 F.Supp. 468, 472–73 (D.R.I.1991).

There is ample evidence in the record based on the court-mandated discovery and the one-day evidentiary hearing to support these findings. An agreement consummated on January 3, 1976, in Las Vegas, Nevada, between Dussault and the state prosecutor when Dussault was first apprehended by Rhode Island authorities, and the testimony of Sergeant William Giblin of the Providence Police Department and Captain Edward Pare, former detective of the Rhode Island State Police, provide concrete evidence of complex and overlapping deals to aid Dussault. Evidence of the actual aid extended consists of testimony about meetings with and letters to law enforcement authorities in other states, especially Massachusetts. Both Giblin's report and Pare's testimony document the fact that the prosecutor promised Dussault he "would not do any time in Massachusetts or Rhode Island." Evidentiary Hearing Transcript, Pare Testimony at 10–11; Giblin Testimony at 12.

The magistrate's findings 8 and 9, which the state contests, are also related. Both deal with Dussault's previous Massachusetts convictions and his escape from prison, which occurred when he still had twenty-one years to serve in that state.

*Finding No. 8:* The Court finds that the evidence adduced on hearing shows that in 1968 Robert Dussault was sentenced to a term of fifteen to thirty years in the Massachusetts state prison and that he was paroled on this sentence to allow him to serve a consecutive sentence in the Greenfield County House of Correction. Dussault escaped from the Greenfield County House of Correction in 1975 ... [with] approximately twenty-one years remaining to serve ... Dussault has never been called upon to resume serving any portion of his Massachusetts state prison sentence. Yet, Massachusetts authorities were aware of Dussault's location in Rhode Island after his arrest by Rhode Island authorities. Rhode Island authorities negotiated and obtained from Massachusetts authorities a termination of the balance of Dussault's Massachusetts state prison sentence, a remission of fifteen to thirty years imprisonment ... not made known to the petitioner. The non-disclosure was calculated to induce Dussault's testimony against Ouimette in the Bonded Vault trial and the same was not disclosed to petitioner at trial.

*Finding No. 9:* The prosecutor agreed to help Dussault dispose of the escape charge, of which he was accused, from Greenfield County House of Correction and the remainder of the Massachusetts House of Correction jail sentence. In furtherance of that goal, the prosecution negotiated with authorities in Greenfield County, Massachusetts and made Dussault available to those authorities to testify that a guard had negligently allowed him to escape from custody. As a result, Dussault received no "jail time" for the escape charge. The defense attorneys in the Bonded Vault trial were told only that Dussault would receive some help from Rhode Island authorities for a matter which might be pending in Massachusetts.

*Id.* at 473.

The amassed evidence easily permits a reasonable inference that an undisclosed deal, indeed, more than one deal, was made both with and for Dussault. The evidence that there was a bargain struck is three-pronged. First, Dussault was never sent back to Massachusetts to serve his unexpired prison term, nor was he further charged for the prison escape. In fact, he was never sent back to Massachusetts at all, except as noted in the next paragraph, though Massachusetts authorities, who were in contact with Rhode Island authorities, knew where he was virtually from the time of his Las Vegas arrest in January 1976.

Second, Dussault did go to Greenfield, Massachusetts, to testify in another criminal prosecution, *Commonwealth v. Russell*

*Baird,* during the time when the Bonded Vault trial was proceeding in Rhode Island. He testified against the prison guard who had assisted in his escape. His presence there at that very time was obviously part of a deal between Massachusetts and Rhode Island authorities. Interestingly, at Baird's trial Dussault, flanked by Rhode Island police officials, was confronted in open court with the full record of his twenty-eight prior convictions, twenty-four of which had not been disclosed to Ouimette at the Bonded Vault trial.

Third, on a pending charge in Massachusetts, the aforementioned robbery of the Mechanic's Bank in Worcester, which occurred after the Bonded Vault robbery, Dussault pled guilty and received a minimum sentence of seven years from which he was immediately paroled. Discovery in Ouimette's habeas case yielded five documents and letters between state officials in Massachusetts and Rhode Island as well as from Rhode Island officials to federal officials pertaining to Dussault's release. Finally, Dussault was promised acceptance into the Federal Witness Program by the state prosecutor, who personally negotiated this for Dussault. Acceptance into this program is predicated on the absence of outstanding criminal charges, so there is a plausible inference that even more undisclosed deals were made.

The sixth contested finding of fact is number 11, dealing with the videotape of the bargain between the prosecutor and Dussault in Las Vegas.

*Finding No. 11:* The Court finds that the videotape of the bargain struck between the prosecutor and Robert Dussault in Las Vegas, Nevada, which was in the exclusive hands of the Attorney General's Office, was never provided to petitioner Ouimette. What was provided was a partial and unauthenticated "unofficial transcript." Petitioner was provided with a copy of a contemporaneous report from Sgt. Giblin and Lt. Rocchio of the Providence Police ... Those reports were contained in the Rhode Island State Police files and produced in this Court by the keeper of the records. Neither this report nor the one provided by the Attorney General's Office mentioned the crimes which were charged and pending against Dussault at the time he was induced to testify on behalf of the State.

*Id.* at 474. This videotape was played in the courtroom at the Bonded Vault trial, but the defendants, including Ouimette, never received a copy. Even after discovery fourteen years later in 1990, Ouimette was given only the partial, unauthenticated transcript described by the magistrate. Although the antecedents to "those reports" and "this report" in the magistrate's finding are a bit unclear, it is evident that he refers to documents "produced in this Court," i.e., the habeas court, not the original trial court. There is no error in the court's assertion that neither the partial transcript of the videotape nor the police report gave any clue to Dussault's full criminal record.

Findings 10, 13 and 14 all relate to Dussault's record and are also contested by the State. Finding 10 deals with discovery.

*Finding No. 10:* The Court finds that, notwithstanding the multiple motions duly filed by co-defendants for exculpatory evidence and for evidence of rewards, promises and inducements made to Robert Dussault in exchange for his testimony, no such discovery was received by any of the defendants until a motion was made during the trial by petitioner's and a co-defendant's counsel under Rule 26.1 Super.R.Crim.P. This motion elicited the prosecutor's response. He produced a list of only four prior convictions of Robert Dussault and a videotape which was viewed by all defense counsel....

*Id.* at 473. As the magistrate noted, a motion was made during trial for production of Dussault's full record. In addition, Ouimette's lawyer requested it at a bench conference during trial. It never appeared despite the production of complete "rap sheets," including minor traffic violations as well as out-of-state charges, for all other government witnesses.

Rhode Island Superior Court Rules of Criminal Procedure 16 provides for pretrial discovery, which was requested by Oui-

mette's co-defendants before the Bonded Vault trial.[5] Rule 16(h) mandates a *"Continuing Duty to Disclose."* If "a party discovers additional material previously requested which is subject to discovery or inspection under this rule, he or she shall promptly notify the other party of the existence thereof." The district court did not err in delineating the "multiple motions duly filed by co-defendants" and concluding that the prosecutor's response was to withhold deliberately all but four convictions.

Findings 13 and 14, relating to the cumulative evidence of Dussault's complete record and rewards, and the prosecutor's non-disclosure can be analyzed succinctly.

*Finding No. 13:* The Court finds that after the request by petitioner's counsel for a complete record of criminal convictions of Robert Dussault, made at a bench conference during the Bonded Vault trial, the prosecutor failed to provide such a complete record. Further, the Court finds the prosecutor could have readily produced a record of some twenty-eight criminal convictions of Dussault, all of which occurred prior to the trial of petitioner.

*Finding No. 14:* The Court finds the exhibits and testimony in this proceeding establish that records of Dussault's prior criminal convictions had been obtained by two major Rhode Island law enforcement agencies ... and that those records were readily available to the prosecutor for the asking at the time of trial. Upon examination of the evidence adduced at hearing, I find that the prosecutor had in his possession some twenty-one felony and seven misdemeanor convictions of Robert Dussault before he began the prosecution of petitioner Ouimette in the Bonded Vault trial.

*Id.* at 474.

There is ample evidence via deposition and testimony that the prosecutor could have produced Dussault's "complete cyclopedia of convictions." *Id.* at 474. Sergeant Giblin, who sat at the prosecutor's table every day of the Bonded Vault trial except the last, testified that he had the full record before the trial and that such records were uniformly turned over to the prosecutor. At the evidentiary hearing Ouimette's lawyer asked Sergeant Giblin:

Q. Did you have conversations with Robert Dussault during the course of this trial and—

A. I had several conversations with Mr. Dussault, up until the time that Mr. Danese decided to turn state's evidence, also, and then he was taken out of my hands, and I didn't see him for a period of months until he testified.

Q. All right. With respect to the pretrial—excuse me, your assisting Mr. DeRobbio at trial, do you recall whether or not during the course of the trial, Prosecutor DeRobbio ever asked you to obtain the criminal history of Robert Dussault?

A. He would have already had them, Ma'am.

Q. He would have had it?

A. Yes, Ma'am.

Q. And he would have had that as a result of your efforts?

A. Yes, Ma'am. He would have had all the records of all the individuals that were involved.

Evidentiary Hearing Transcript, Giblin Testimony at 27–28.

Captain Pare, in response to the magistrate's questions, answered that it was common practice for his office to turn over to the prosecutor all criminal records in his possession.

THE MAGISTRATE: Captain, tell me, is it routine practice and procedure in police work to obtain criminal histories of those suspected of being, as in this case, a lead robber?

THE WITNESS: It is routine, yes, your honor.

THE MAGISTRATE: Was that routinely done in this case?

THE WITNESS: I would say yes.

---

5. Although the state originally claimed that Ouimette should have asserted that right personally, it has wisely not argued the point, an incorrect one, in its appellate brief.

THE MAGISTRATE: And was that done while the trial was ongoing in the Ouimette case?

. . . . .

THE WITNESS: I would say probably before trial occurred.

THE MAGISTRATE: And thus the so-called record of approximately 21 convictions was know[n] to the police, was it not, involving this so-called lead robber, Dussault?

MR. GORMAN: [attorney for State] Your Honor, I'm not sure that the record shows that this witness is aware of any particular number of—

THE MAGISTRATE: Well, he just answered that that's the common practice. Was it done in this case? He said yes, it was. . . .

Evidentiary Hearing Transcript, Pare Testimony at 23–24.

Even the state trial court judge in Rhode Island expressed amazement at the prosecutor's statement regarding Dussault's truncated record before the court: "He [Dussault] testified he had been involved for 20 years, and I was sort of surprise [sic] the only convictions presented were four, and they seem to be minor ones." Petitioner's Supplemental Record Appendix, no. 9 (Justice Giannini at bench conference, July 26, 1976).

## IV. *BRADY* ISSUE

■ The state contends that in granting habeas corpus relief, the magistrate erred in his analysis under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The now-familiar *Brady* requirements as defined before the fact by *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and refined after the fact by *Giglio v. United States*,

405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), are three. Constitutional error exists if there is: (1) some form of defense request for non-disclosed or suppressed material;[6] (2) "suppression by the prosecution of evidence favorable to an accused upon request," *Brady, supra,* 373 U.S. at 87, 83 S.Ct. at 1196–97; and (3) evidence which is "material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* Impeachment evidence as well as exculpatory evidence falls within the *Brady* rule. *See also Giglio*, 405 U.S. at 151, 92 S.Ct. at 764 (Failure to disclose promise made to key government witness is material, hence denies due process to defendant.); *Napue v. Illinois*, 360 U.S. at 269, 79 S.Ct. at 1177 (Denial of due process exists even when uncorrected false testimony goes merely to witness credibility.). *See also* Note, *The Prosecutor's Constitutional Duty to Reveal Evidence to the Defendant*, 74 Yale L.J. 136, 138 (1964) (discussing denial of due process under *Napue* even when no specific show of prejudice).

■ In the instant case, there was clearly more than one request made for exculpatory material by Ouimette and his co-defendants. A Rhode Island Superior Court Rules of Criminal Procedure 26.1 motion was made at trial by one defense lawyer and accepted by the trial judge as applying equally to all six co-defendants. Magistrate's Finding of Fact No. 3. Ouimette's own attorney made a second such request at sidebar during the trial at which time the prosecutor hinted that Dussault's conviction record might be incomplete, but he was not forthcoming with details or additional evidence. Petitioner's Supplemental Record Appendix, No. 9. Even though Ouimette was acting pro se in the period immediately before his trial, two of his co-defendants made the necessary Rule 16 motion

---

**6.** Even the need for a definitive defense request is not carved in stone. Not all courts have "ruled that a request is indispensable," but most have required a stronger showing of materiality in the absence of a request. Defense failure to request withheld material, however, does not necessarily indicate lack of due diligence. For defense counsel may not be sufficiently aware of the existence of certain facts or records

known to the prosecution to frame a request for them. "And since a defendant's knowledge of the existence of allegedly suppressed evidence is not readily susceptible to proof, it would be futile to require such a request only when the defendant knows that the evidence exists." Comments, *Brady v. Maryland and the Prosecutor's Duty to Disclose*, 40 U.Chi.L.Rev. 112, 117 (1972).

under Rhode Island Superior Court Rules of Criminal Procedure for pre-trial discovery. Rule 16(a) requires the prosecutor to exercise "due diligence" to obtain such materials for the defendant. That the prosecutor intentionally withheld materials relating to Dussault's prior criminal record and the deals he made with the state in return for his testifying against Ouimette is established conclusively by the record and the magistrate's findings.[7]

In *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), decided in the same year as Ouimette's trial, the Court emphasized the prosecutor's duty to disclose voluntarily "anything exculpatory," whether the defendant has made "merely a general request" or "no request at all." *Id.* at 106–07, 96 S.Ct. at 2399. *Agurs* also characterized the materiality standard, the third *Brady* component going to constitutional error, as "an inevitably imprecise standard"; therefore, the Court stressed that "the prudent prosecutor will resolve doubtful questions in favor of disclosure." *Id.* at 108, 96 S.Ct. at 2399–2400.

*Agurs* further held that the proper standard of materiality of undisclosed evidence is whether the omitted evidence created a reasonable doubt regarding outcome: "if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed." *Id.* at 112, 96 S.Ct. at 2402. The Court clarified and strengthened the materiality standard of *Brady* by linking it conditionally to trial outcome: "A fair analysis of the holding in *Brady* indicates that implicit in the requirement of materiality is a *concern* that the suppressed evidence *might have affected* the outcome of the trial." *Id.* at 104, 96 S.Ct. at 2398 (emphasis added).

The Court's use of the subjunctive "might," indicating possibility, not necessarily actuality, is instructive in application to Ouimette's case. Here, the district court found that deliberate suppression of the bulk of the prior criminal record of the state's star witness and the deals made with him to testify created a reasonable doubt about the jury verdict convicting Ouimette.[8] Following *Agurs*, we agree that

**7.** The district court has concluded bluntly: "How the State can now be heard to claim [that] the prosecutor at trial did not have in his possession the complete record of Dussault's convictions is beyond this Court's comprehension." It placed the blame directly on the prosecutor: "the Court can arrive at no other conclusion but that the prosecutor intentionally suppressed the requested evidence." *Ouimette v. Moran,* 762 F.Supp. 468, 476, 477 (D.R.I.1991).

**8.** We list below the prior convictions of Dussault both disclosed and undisclosed to the jury at the Bonded Vault trial.

A. *Prior convictions disclosed:*
09–03–58—Attempted Larceny—6 months HOC
09–03–58—Unlawful Opening of Police Box—1 month HOC
08–05–64—Breaking and entering with intent to commit larceny—2½ to 3 years state prison
02–26–68—Accessory before fact of bank robbery—15 to 30 years Massachusetts state prison
Trial Transcript at 2574–75.
B. Prior convictions undisclosed:
FELONIES:
1) 07–07–58 Attempted larceny, auto—6 months HOC, 2 years probation
2) 09–21–59 Break and enter—6 months jail
3) 12–05–62 Att. to commit larceny—2 months

4) 08–05–64 Larceny—2½–3 years
5) 09–16–66 Assault on a police officer—3 months
6) 09–16–67 Armed robbery
7) 09–16–67 Armed robbery
8) 04–04–68 Armed robbery 10–12 years
9) 04–04–68 Accessory before the fact of armed robbery 10–12 years
10) 04–04–68 Accessory before the fact of armed robbery while masked and disguised—10–12 years
11) 04–04–68 Armed robbery while masked and disguised—10–12 years
12) 04–04–68 Armed robbery—7–10 years
13) 04–04–68 Armed assault to rob—10–12 years
14) 04–04–68 Armed robbery—10–12 years
15) 04–04–68 Armed robbery—10–12 years
16) 10–20–72 Auto theft
17) 01–14–73 Escaped from confinement—1 year
MISDEMEANORS:
18) 09–03–58 Interfered with police signal system—30 days jail
19) 02–25–60 Drunk—30 days HOC & 1 year probation
20) 02–25–60 Disturbing the peace—$10.00 fine
21) 07–03–61 Property damage—$25.00 or 25 days
22) 01–25–65 Drunk—$10.00 fine
23) 10–25–65 Mal. injury to property—$25.00 fine

beyond any doubt there exists in this case a genuine "concern" that the suppression of such impeachment evidence "might have affected the outcome of the trial." *Id.* at 104, 96 S.Ct. at 2398. *See also United States v. Bagley*, 473 U.S. 667, 678, 105 S.Ct. 3375, 3381–82, 87 L.Ed.2d 481 (1985) (quoting *Agurs*, 427 U.S. at 103 & 112, 96 S.Ct. at 2397 & 2401–02 and stating that constitutional error can result from government "failure to assist the defense by disclosing information that might have been helpful in conducting the cross-examination" *if* "such suppression of evidence," in fact, "deprives the defendant of a fair trial").

Of special pertinence here, the Court in *Agurs* applied a "strict standard of materiality" to cases which involve "prosecutorial misconduct" and "a corruption of the truth-seeking function of the trial process." *Agurs*, 427 U.S. at 104, 96 S.Ct. at 2397. In so doing, the Court cited a series of cases beginning with *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), in which "the prosecution's case include[d] perjured testimony and ... the prosecution knew, or should have known, of the perjury." *Id.* at 103, 96 S.Ct. at 2397 (footnote omitted). These cases, which include *Napue v. Illinois*, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959), and *Giglio v. United States*, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), all hold, following this strict standard of materiality, that

a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is *any reasonable likelihood* that the false testimony *could have affected* the judgment of the jury.

*Id.* (footnote omitted) (emphasis added). *See also Id.* at 103 n. 8, 96 S.Ct. at 2397 n.

8 (delineating series of Supreme Court holdings on this issue).

Ouimette's guilty verdict presents such a case for applying this strict standard of materiality because the prosecutor himself was responsible for the defendant's inability to cross-examine the government witness fully. The probability of constitutional error in Ouimette's case must therefore be measured by "any reasonable likelihood" that this knowing prosecutorial suppression of evidence "could have affected the judgment of the jury." Hence, such suppression of evidence becomes material even if there is only a reasonable possibility that Ouimette's conviction ensued because a jury uninformed of Dussault's criminal records and his deals with the state heard this star witness for the state implicate Ouimette without impeachment. We agree with the district court that the prosecutor himself was responsible for this misrepresentation to the jury and that his actions created at least a "reasonable likelihood" of affecting its conviction of Ouimette. *See also Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987) (Evidence is material if there is a reasonable probability of a different result with its disclosure.). *But see United States v. Devin*, 918 F.2d 280 (1st Cir.1990) (applying *Brady* and *Agurs* to find harmless error in non-disclosure); *United States v. Pandozzi*, 878 F.2d 1526 (1st Cir.1989) (Failure to disclose evidence at trial does not warrant new trial if witness was thoroughly cross-examined and disclosure would not alter outcome.).

The state has sought to mitigate the damaging effects of its constitutional error under the harmless error standard. In *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), however,

---

24) 10-25-66 Disturbing the peace—guilty, filed
*Ouimette v. Moran*, 762 F.Supp. at 474–75 (D.R.I.1991).
In addition, the jury did not know and should have known the full extent of promises and deals made by the prosecutor in return for Dussault's testimony. A videotape made in Las Vegas in January 1976 at the time of Dussault's arrest was produced at trial and provided partial disclosure of the agreement made then be-

tween the prosecutor and Dussault in which the former promised that if Dussault testified in the Bonded Vault trial, he would serve no time on those charges and that Rhode Island officials would attempt to ameliorate Dussault's Massachusetts sentence from which he had escaped. The only crimes delineated on the videotape, however, related directly to the Bonded Vault robbery, and the only reference to previous convictions was to Dussault's unserved sentence in Massachusetts.

the Court not only created the standard of "harmless beyond reasonable doubt"; it also noted that

> there was little, if any difference between a rule formulated, as in *Napue,* in terms of " 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction' " and a rule " 'requiring the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.' "

*Id.* at 24, 87 S.Ct. at 828 (quoting *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)), *quoted in Bagley,* 473 U.S. at 679–80 n. 9, 105 S.Ct. at 3382 n. 9. Hence, we make short shrift of the state's insistence that, despite constitutional error, the outcome of Ouimette's trial was never in doubt.

The evidence against Ouimette was almost entirely generated by Dussault. His testimony was inconsistent at points, even without defense opportunity to impugn his credibility with full impeachment regarding his deals and prior convictions. We second the conclusions of the district court: "I can think of no matter more material than a complete record of previous convictions of the State's star witness, Dussault, to be used for demonstrating the unworthiness of belief of his testimony against Ouimette." *Ouimette v. Moran,* 762 F.Supp. 468, 476 (1991). We note that Rhode Island Superior Court Judge James Bulman, in reviewing Dussault's previously undisclosed criminal record as presented in Ouimette's petition for post-conviction relief, observed: "I agree with you that the record he [Dussault] has would be so devastating were it shown to a jury, it could be much more than impeachment ... you would have to be in a sleepwalker [sic] dream to think that records like that wouldn't influence a jury." Post–Conviction Relief Transcript, Dec. 7, 1987, at 16.

■ There is one final matter that must be addressed. On March 8, 1983, seven years after Ouimette was found guilty and sentenced to life imprisonment, he pled guilty to the crime charged. After his plea Ouimette's sentence was reduced from life to forty-five years, with fifteen years suspended. The state argues, in effect, that this post-verdict plea erases, or at least shrinks to harmless errors, the due process violations committed during the trial. Ouimette, of course, contends that the plea was coerced. We do not think that Ouimette's subsequent guilty plea cleanses the state of its constitutional sins or mitigates their effect. The question before us is whether Ouimette's due process constitutional rights were violated *at his trial.* We have found that they were. Had there been no due process violations, there might well have been no sentencing and resentencing.

■ Moreover, we do not think that the state can raise this issue now because it was not raised below. The question of the effect of Ouimette's subsequent guilty plea was not raised by the state in its answer or at the evidentiary hearing. The only one who adverted to the guilty plea was Ouimette himself. In footnote 1 of the magistrate's opinion, it is stated:

> Lastly, in his application for post-conviction relief, petitioner claimed he was denied due process on a third ground. Petitioner urges that he was induced, at his resentencing hearing in the Superior Court in March 1983, to waive his privilege against self-incrimination as well as a pending federal *habeas corpus* petition in exchange for a promise of a substantial sentence reduction that never materialized. Petitioner reasserts this claim in the instant petition. I need not and do not reach this last claim.

*Ouimette v. Moran,* 762 F.Supp. 468, 469 (1991).

This circuit religiously follows the rule that issues not presented to the district court cannot be raised on appeal. *Ramos v. Roche Products, Inc.,* 936 F.2d 43, 50–51 (1st Cir.1991) (quoting *Hernandez–Hernandez v. United States,* 904 F.2d 758, 763 (1st Cir.1990) (citing *Johnston v. Holiday Inns,* 595 F.2d 890 (1st Cir.1979))).

In summary, we quote liberally from the conclusion to the magistrate's opinion:

> Although unbridled prerogative powers of government were abolished in Eng-

land by Magna Charta in 1215 A.D. and in America by the Constitution's Bill of Rights, here, they were alive and well in Rhode Island. Rhode Island's prosecutorial team enjoyed exclusive and peculiar privilege to fashion and shape Dussault as a credible witness against the accused. The prosecutions' coverup and censorship at trial of their preemptive activity is what remains as constitutionally actionable.

Having done this was not enough. Officialdom secreted and failed to disclose at petitioner's trial some twenty-eight criminal convictions of their star witness, Dussault, as surety for the conviction of the petitioner. All of this, the State seeks today to defend and justify. His trial was based upon prosecutorial concealment and not upon disclosure. These discredited practices not only do violence to constitutional notions of due process, they do violence to fundamental notions of justice and fair play which all free people should enjoy. The State's assertion and exercise of prerogative powers and censorship may not transcend the Constitution.

*Ouimette v. Moran*, 762 F.Supp. 468, 479.

We affirm the order of the district court issuing the writ of habeas corpus and releasing Ouimette from state prison.